CHAISSON, J.
11'Whitney May Bonilla appeals the trial court judgment granting an exception of prematurity filed by Jefferson Parish Hospital Service District #3, Parish of Jefferson, d/b/a East Jefferson General Hospital (“EJGH”), which dismissed without prejudice Ms. Bonilla’s administrative negligence claim against the hospital administrators. For the following reasons, we affirm the judgment of the trial court. FACTS AND PROCEDURAL HISTORY
The facts of the case against EJGH at this interlocutory stage of the proceedings are taken from Ms. Bonilla’s petition for damages, which incorporates the facts set forth in her claim against the hospital and various physicians before a medical review panel. The facts as alleged in the petition are as follows:
Ms. Bonilla was admitted as a patient to EJGH on Saturday, August 31, 2013, with complaints of abdominal pain, nausea, and dizziness. At that time she was 37 weeks pregnant, and her obstetrician, Dr. Christina Goodridge, diagnosed her with chorioamnionitus, a bacterial infection affecting the membranes surrounding the fetus and amniotic fluid. Dr. Goodridge immediately proceeded with a primary Cesarean section, and Ms. Bonilla’s child was delivered on August 31. Ms. Bonilla remained a patient at EJGH for the next four days, during which time she received antibiotic treatment for her infection. While a patient at the hospital, Ms. Bonilla was under the care of two treating physicians: Dr. Goodridge and Dr. Robert Hogan. On August 31, Dr. Goodridge transferred (or “handed off’) care of Ms. Bonilla to Dr. Hogan, who himself transferred care of Ms. Bonilla back to Dr. Goodridge on September 3. Ms. Bonilla was discharged from EJGH on September 4. On September 6, she was again admitted to EJGH and diagnosed with acute sepsis, acute multi-organ failure, and acute septic shock. This diagnosis was confirmed via exploratory laparotomic surgeries on laSeptember 7 and September 10. As a result of the sepsis and toxic shock syndrome, Ms. Bonilla’s hands and feet became gangrenous, and surgeons were forced to amputate her limbs, including her right arm at the mid-forearm, her left hand at the wrist, and both legs below the knee. Ms. Bonilla was discharged from EJGH on October 10 to an inpatient rehabilitation program. After four weeks in the rehab program, she returned to her parents’ home on November 7. Since that time she has been hospitalized on multiple occasions for a variety of setbacks resulting from her amputations.
On June 10, 2014, Ms. Bonilla filed a medical malpractice complaint with the Commissioner of Administration wherein she named as defendants Dr. Goodridge, Dr. Hogan, and EJGH. In that complaint, Ms. Bonilla alleges that the physicians committed malpractice by failing to treat *543 her infection with a proper course of antibiotics, and that the hospital is vicariously liable for the acts and omissions of the EJGH employees and of the physicians.[1],[2]
On November 12, 2015, prior to the medical review panel rendering its decision on the claims for malpractice, Ms. Bonilla filed a petition for damages against EJGH in the 24th Judicial District Court for the Parish of Jefferson.[3] In her petition, Ms. Bonilla alleges a tort claim sounding in general negligence against EJGH, claiming that before she was ever admitted to the hospital, the EJGH Ijjadministrators had a duty to implement an administrative policy setting forth the procedure for physicians to follow when handing off patients. She alleges in her petition multiple substantial, contributing causes of her catastrophic injuries: the two improper handoffs by the physicians and the administrative failure to adopt a hospital-wide handoff policy. Although EJGH is named as a defendant tortfeasor in both her petition for damages filed in the district court and in her medical malpractice complaint filed with the Commissioner of Administration, and she alleges the same damages in both the petition and the complaint, Ms. Bonilla argues that her claim against the hospital administrators is an independent tort under a theory of general negligence that should be heard and tried separately from the medical malpractice claim.[4] She also states that the negligence claim asserted against EJGH is ripe for judicial determination because the Louisiana Medical Malpractice Act (“LMMA”) does not apply to her claim for administrative negligence.
On December 23, 2015, EJGH filed a dilatory exception of prematurity and peremptory exceptions of no cause of action and no right of action. For the dilatory exception of prematurity, EJGH argued that it is a qualified health care provider under the LMMA and, because Ms. Bonil-la’s claims arise from malpractice, they must first be presented to a medical review panel as required by La. R.S. *544 40:1231.8(A)(l)(a).[5] For the peremptory exception of no cause of action, EJGH argued that, based on the facts alleged in Ms. Bonilla’s petition, the law does not provide a remedy against EJGH because she alleges that the negligent Uaction took place before she was a patient, a time when there was no legal relationship between the parties.
In response to EJGH’s exception of prematurity, Ms. Bonilla argues (as she did in eonclusory statements in her petition) that her administrative negligence claim against EJGH sounds in general negligence, and is a separate and independent act of negligence from the acts of medical malpractice by the physicians. She therefore argues that her claim against EJGH for administrative negligence falls outside the purview of the LMMA.
A hearing on EJGH’s exceptions was held on February 4, 2016. At the hearing, no evidence was introduced by either party, although under La. C.C.P. art. 930, evidence may be introduced at a trial on a dilatory exception to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition. Following argument from both sides on the dilatory exception of prematurity, EJGH withdrew the peremptory exceptions of no cause of action and no right of action. The trial court granted the dilatory exception of prematurity. In its oral reasons for judgment, the court applied the multi-factor test set forth in Coleman v. Deno, 01-1517 (La. 1/25/02), 813 So.2d 303, 315-16, to determine that Ms. Bonilla’s claims sound in medical malpractice rather than general tort, and therefore must first be submitted to a medical review panel pursuant to the provisions of the LMMA.[6] The judgment sustaining the exception of prematurity was amended on February 18,2016, to clarify that Ms. Bon-illa’s claim against [¿EJGH had been dismissed without prejudice, and to designate the judgment as final for purposes of appeal. Ms. Bonilla’s timely appeal followed.
On appeal, Ms. Bonilla asserts that the district court erroneously held that her administrative negligence claim sounded in medical malpractice rather than general tort and improperly granted EJGH’s dilatory exception of prematurity. Ms. Bonilla has also filed a motion to strike the exhibit attached to EJGH’s appellee brief, purporting to be an EJGH handoff policy in effect at the time of her treatment, and EJGH’s arguments related thereto.
MOTION TO STRIKE
We first address Ms. Bonilla’s motion to strike the exhibit attached to EJGH’s appellee brief. Regarding material attached to briefs on appeal, but not introduced at trial, we have previously stated:
*545 Pursuant to La. C.C.P. art. 2164, an appellate court must render judgment upon the record on appeal. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, judgments, and other rulings, unless otherwise designated. La. C.C.P. arts. 2127 and 2128. An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. The appellate briefs of the parties are not a part of the record on appeal, and this Court has no authority to consider facts referred to therein if those facts are not in the record. Examination of exhibits attached to an appellate brief, but not offered into evidence at the trial court, is beyond the scope of our review. Distefano v. B & P Const., Inc., 04-25, pp. 4-5 (La.App. 5 Cir. 5/26/04), 874 So.2d 407, 411, writ denied, 04-1735 (La. 10/15/04), 883 So.2d 1058.
Deutsche Bank Nat’l Tr. Co. ex rel. Morgan Stanley ABS Capital I, Inc. v. Carter, 10-663 (La.App. 5 Cir. 01/25/11), 59 So.3d 1282, 1285.
We find that EJGH’s exhibit, which was attached to its appellee brief, and thus not part of the record, is not properly before this Court and may not be considered on appeal. Accordingly, we grant Ms. Bonil-la’s motion to strike the exhibit attached to EJGH’s appellee brief and its arguments referencing that exhibit.
1 (¡DILATORY EXCEPTION OF PREMATURITY
The dilatory exception of prematurity questions whether the cause of action has matured to the point where it is ripe for judicial determination. La. C.C.P. art. 926; Buford v. Williams, 11-568 (La. App. 5 Cir. 2/14/12), 88 So.3d 540, 543. An action is premature when it is brought before the right to enforce it has accrued. La. C.C.P. art. 423. Under the Louisiana Medical Malpractice Act, a medical malpractice claim against a private qualified healthcare provider is subject to dismissal on an exception of prematurity if the claim has not first been presented to a medical review panel.[7] La. R.S. 40:1231.8(A)(1)(a); LaCoste v. Pendleton Methodist Hosp., L.L.C., 07-0008 (La. 9/5/07), 966 So.2d 519, 523. The burden of proving prematurity is on the exceptor to show that it is entitled to a medical review panel. Williamson v. Hospital Serv. Distr. No. 1 of Jefferson, 04-0451 (La. 12/1/04), 888 So.2d 782, 785. Accordingly, the question before this Court is whether Ms. Bonilla’s claim as stated in her petition is one of medical malpractice. A case must proceed with the procedure set forth in the LMMA if the claims sound in malpractice, but should proceed under general tort law if the claims sound in negligence. Dupuy v. NMC Operating Co., L.L.C., 15-1754 (La. 3/15/16), 187 So.3d 436, 440. Where no evidence is presented at the trial of a dilatory exception of prematurity, the court must render its decision on the exception based upon the facts as alleged in the petition, and all allegations therein must be accepted as true; however, this latter principal applies only to properly pleaded material allegations of fact, as opposed to allegations deficient in material detail, conclusory factual allegations, or allegations of law. Hamilton v. Baton Rouge Health Care, 09-0849R (La. App. 1 Cir. 12/08/10), 52 So.3d 330, 333. The issue of whether a claim sounds in medical malpractice is a question of law conducted under a de novo standard of review. Matherne v. Jefferson Parish Hospital *546 Dist. No. 1, 11-1147 (La.App. 5 Cir. 5/8/12), 90 So.3d 534; Buford, 88 So.3d at 544, citing Hernandez v. Diversified Healthcare-Abbeville, LLC, 09-546 (La. App. 3 Cir. 11/4/09), 24 So.3d 284, 285, writ denied, 09-2629 (La. 2/12/10), 27 So.3d 849.
In her petition, Ms. Bonilla makes the following specific allegations of negligence against EJGH:
15.
EJGH’s administrators were negligent in failing to implement an Administrative Policy regarding patient handoffs by physicians before Ms. Bonilla was admitted as a patient. For example:
• EJGH’s administrators failed to adopt and implement a written Administrative Policy governing the process by which patients would be handed off by sending physicians and receiving physicians.
• EJGH’s administrators failed to create a standardized approach to patient handoffs between physicians.
• EJGH’s administrators failed to provide for the development of standardized tools and forms for physicians to use during patient handoffs.
• EJGH’s administrators failed to identify the type of information that the physicians should exchange about the patient in a handoff.
• Instead of implementing a reasonable Administrative Policy, EJGH’s administrators left it up to each physician to decide how to hand off a patient.
21.
The negligence of EJGH’s administrators in failing to implement an Administrative Policy governing patient handoffs between physicians, which led to improper handoffs of Ms. Bonilla, was a substantial contributing cause of her catastrophic injuries.
With regard to the physicians, Ms. Bonilla makes the following allegations:
1.
.. .Ms. Bonilla was subjected to two inadequate and improper handoffs by her physicians while a patient at the Hospital. These improper handoffs were a substantial, contributing cause of Ms. Bonilla’s catastrophic injuries...
[[Image here]]
The first handoff occurred on Saturday, August 31, 2013... Neither Dr. Hogan nor Dr. Goodridge recall having a conversation, or any other communications, as part of the handoff.
18.
On Tuesday morning, September 3, 2013... Dr. Hogan handed off Ms. Bon-illa to Dr. Goodridge. Again the two physicians do not recall having a conversation, or any other communications, as part of the second handoff.
19.
Due to the negligence of EJGH’s administrators in failing to have an appropriate Administrative policy governing patient handoffs between physicians, Dr. Goodridge and Dr. Hogan were left to decide on their own how to handoff a patient. As to their personal practice, Dr. Hogan and Dr. Goodridge did not provide “specific” information about a patient’s condition, their clinical impression of the patient, or even their diagnosis of a patient’s condition when handing off a patient. Their practice does not comply with the requirements of an appropriate Administrative Policy for patient handoffs between physicians.
20.
Due to the lack of an Administrative Policy, both handoffs of Ms. Bonilla between Dr. Goodridge and Dr. Hogan were unreasonable and inadequate under the circumstances. These improper *547 handoffs were a foreseeable result of EJGH’s administrators’ breach of their duty to implement an appropriate Administrative Policy regarding patient handoffs by physicians.
The Supreme Court has emphasized that the LMMA and its limitations on tort liability for a qualified health care provider apply strictly to claims “arising from medical malpractice,” La. R.S. 40:1231.1(1), and that all other tort liability on the part of the qualified healthcare provider is governed by general tort law. Williamson, 888 So.2d at 786. As a civilian jurisdiction, we look first to the plain language of the statute, and only resort to interpretive analysis when there is some ambiguity. La. C.C. art. 9; McMillian v. Westwood Manor Nursing Home, Inc., 12-54 (La.App. 3 Cir. 5/30/12), 92 So.3d 623, writ denied, 12-1857 (La. 11/9/12), 100 So.3d 839. The LMMA provides the following definitions relevant to our discussion in this case:
“Malpractice” means any unintentional tort or any breach of contract based on health care or professional services rendered, or which | ¡¡should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the pei’son of a patient. “Tort” means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
“Health care” means any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient’s medical care, treatment, or confinement, or during or relating to or in connection with the procurement of human blood or blood components.
La. R.S. 40:1231.1(A)(13), (22), and (9). (Emphasis added.)
Under these definitions, we find that Ms. Bonilla’s allegations that she was improperly handed off clearly constitute claims for medical malpractice against her treating physicians, Dr. Goodridge and Dr. Hogan. Ms. Bonilla has alleged that the unreasonable, inadequate, and improper handoffs were substantial and contributing causes of her catastrophic injuries, which would make the handoffs unintentional torts based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient.[8]
We conclude that Ms. Bonilla’s allegations against EJGH hospital administrators for negligent failure to adopt a han-doff policy also sound in malpractice under these definitions. The legislature amended *548 the definition of malpractice under the LMMA in 2001 to include “all legal responsibility ... arising from acts and omissions ... in the training and supervision of healthcare | inproviders ...” As Ms. Bonilla states in her petition, “E JGH’s administrators left it up to each physician to decide how to hand off a patient.” In other words, Ms. Bonilla alleges that the administrators failed to, by way of a written policy, provide training and supervision of the physicians’ handoffs. Additionally, the adoption of a written handoff policy like the one described in Ms. Bonilla’s allegations would necessarily require the supervision and monitoring of physician-to-physician handoffs of patients to ensure that the standardized tools and forms were being used, and that the necessary information about the patient was being communicated. Furthermore, any physician working at EJGH would necessarily need to be trained to handoff patients according to the standardized approach set forth in an EJGH physician-to-physician handoff policy. Therefore, Ms. Bonilla’s complaint regarding the lack of a handoff policy is a complaint that EJGH failed to provide training and supervision, by way of a written policy, of physicians performing han-doffs in the hospital, and therefore falls squarely within the definition of malpractice under the LMMA.
An analysis of Ms. Bonilla’s claim under the Coleman factors further supports the conclusion that the claim sounds in medical malpractice. However, prior to undertaking this analysis, we note a preliminary general observation regarding the Coleman factors. The basic and pertinent facts in Coleman are that the plaintiff went to the emergency room of one hospital, where the attending physician diagnosed a celluli-tis infection of his left arm, but made the decision to transfer the plaintiff to Charity Hospital for the necessary treatment. After unsuccessful attempts at treatment, the plaintiffs arm was amputated three days later at Charity Hospital. In his claim against the emergency room physician from the first hospital,[9] the plaintiff argued that the decision by this physician to transfer him was strictly an economic decision, rather than a treatment decision, and | ntherefore outside the scope of the LMMA. One of the eventual issues before the Louisiana Supreme Court was whether all of the decisions made by the physician, including the decision to transfer the plaintiff, were decisions related to treatment such that they fell under the purview of the LMMA and its cap on damages. In that factual context, the Court, in concluding that the decision to transfer the plaintiff was part of the physician’s treatment rendered to the plaintiff, articulated six factors that should be considered in determining whether certain conduct by a qualified health care provider constitutes “malpractice” as the term is defined under the LMMA. Thus, the Coleman factors were not initially adopted in the context of analyzing claims of alleged administrative negligence by hospital administrators who, unlike physicians, generally are not directly involved in the hands-on treatment of patients. In analyzing these types of administrative negligence claims, application of the Coleman factors becomes a much more challenging exercise, but one that the Louisiana Supreme Court has nonetheless undertaken in these types of cases. See Williamson, supra; Blevins v. Hamilton Med. Ctr., Inc., 07-127 (La. 6/29/07), 959 So.2d 440; LaCoste, supra; Dupuy, supra; and Billeaudeau v. Opelousas Gen. Hosp. Auth., 16-0846 (La. 10/19/16), _ So.2d _, 2016 WL 6123862, 2016 La. LEXIS 2082.
*549 In Coleman, the Court articulated the six factors as follows:
1. Whether the particular wrong is ‘treatment-related’ or caused by a dereliction of professional skill,
2. Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,
3. Whether the pertinent act or omission involved assessment of the patient’s condition,
4. Whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,
5. Whether the injury would have occurred if the patient had not sought treatment, and
|126. Whether the tort alleged is intentional.
Coleman, 813 So.2d at 315-316.

Whether the particular imvng is treatment-related or caused by a dereliction in professional skill

This particular factor implicates the issue of causation, with the primary focus being on the alleged act or omission of the tortfeasor. Ms. Bonilla argues that the particular wrong alleged, i.e., not adopting a written handoff policy governing inter-physician communications about a patient’s medical condition, is not directly related to the treatment of the patient and was not caused by dereliction of professional skill. In support of this position, she cites two cases from the Louisiana Supreme Court: LaCoste v. Pendleton Methodist Hosp., L.L.C., supra, and the recent decision in Billeaudeau v. Opelousas General Hospital Authority, supra. We find that both LaCoste and Billeaudeau are distinguishable from the case before us.
In LaCoste, the Court held that a hospital’s negligent failure to design, construct, and/or maintain its facility to provide emergency power to sustain life support systems during and in the aftermath of Hurricane Katrina, and the failure to implement adequate evacuation plans or have facilities available to transfer patients to in emergency or mandatory evacuations, did not directly relate to medical treatment or a dereliction of professional skill within the meaning of the first Coleman factor. LaCoste, 966 So.2d at 525-26. We find LaCoste to be distinguishable from the present case for two reasons. First, the allegations against the hospital in LaCoste related to its operation of the facility itself during a natural disaster, and its failure to provide an adequate facility, either within the hospital itself or at an alternative facility, during that emergency. Whether the physical facility has adequate electricity and water, or whether adequate transportation is provided to evacuate patients to an alternative facility, are not the types of arrangements that require specialized medical knowledge to implement.
haSecond, in LaCoste, there were no allegations of malpractice against any physicians. The plaintiffs only alleged claims of general negligence, and those claims were alleged solely against the hospital administrators. Id. at 521. In the case before us, in addition to the claim made against EJGH for administrative negligence, Ms. Bonilla has also made allegations against her treating physicians that sound in medical malpractice. Of particular importance, in our view, is the fact that the viability of her claim against the hospital administrators is entirely dependent on the existence of the subsequent underlying medical malpractice by the physicians. In other words, if there was no subsequent improper han-doff by her physicians, then the presence or absence of a written policy dictating *550 how physicians handoff their patients is immaterial and irrelevant to Ms. Bonilla’s injury. Absent this crucial link between the alleged administrative negligence of the hospital administrators and the subsequent alleged malpractice of the physicians in transferring Ms. Bonilla, she has no cause of action against the hospital.
While this same inextricable dependency of the administrative negligence claim upon a subsequent act of medical malpractice by the physicians is true of the claims involved in Billeaudeau, we find the claims in Billeaudeau distinguishable from the administrative negligence claim before us because of the difference in the nature of the claims. In Billeaudeau, the plaintiffs brought suit against a hospital for injuries arising from medical malpractice of a doctor who was an independent contractor working in the hospital’s emergency department. Along with the malpractice claims, the plaintiffs specifically alleged that the hospital was negligent in credentialing the doctor. In its application of the Coleman factors to that case, the Court noted that whether or not a particular wrong should be considered inherently “treatment-related” is a factor that can be artfully argued either way. In that case, the Court found that the decision to hire a physician in |uand of itself is administrative and does not directly relate to the treatment of any given patient or involve a dereliction of professional skill. Billeaudeau, 16-0846 at p. 27.[10] The Court stated that “the treatment-related medical decisions and dereliction of skill with which the LMMA is concerned, and for which a hospital can be held liable for malpractice, fall under the ‘supervision and training of the health care providers’ once they enter the building and engage in the practice of medicine therein.” Id.
The case before us does not involve a claim of negligent credentialing. According to Ms, Bonilla’s petition, both Dr. Goo-dridge and Dr. Hogan were credentialed physicians with “privileges” to work at the hospital and practice medicine therein, and both handoffs occurred while the physicians and Ms. Bonilla were in the hospital. Furthermore, the act of credentialing of a physician, which merely allows access to the hospital, does not thereafter dictate to that physician how to practice any aspect of medicine once she is credentialed. To the contrary, the handoff policy in question in this case would specifically dictate to physicians what information they must share with each other concerning a patient’s medical condition when transferring that patient between physicians. Necessarily, any physician practicing medicine in a hospital with such a policy would have to be trained according to the policy, and enforcement of the policy would require supervision and monitoring of the physician’s practice of medicine by the hospital administrators. In our view, the failure of EJGH to enact a handoff policy as suggested by Ms. Bonilla, is the type of treatment-related medical decision for which a hospital can be held hable for malpractice under the “supervision and training of the health care providers” once they enter the building and engage in |1sthe practice of medicine therein. Consequently, not only is the viability of Ms. Bonilla’s cause of action against the hospital administrators entirely dependent on the existence of the subsequent underlying medical malpractice by *551 the physicians, but the complained of administrative negligence of the hospital administrators in failing to enact a handoff policy is specifically directed to instructing physicians on how to provide the very treatment to patients that Ms. Bonilla alleges her physicians negligently provided to her.
Additionally, regarding the “treatment-related” Coleman factor, Ms. Bonilla argues that the administrators’ failure to adopt a policy cannot be directly related to her treatment at EJGH because the negligent omission occurred before she was admitted to the hospital on August 31, 2013. A similar argument was recently addressed by the Supreme Court in Dupuy v. NMC Operating Co., L.L.C., supra. In that case, concerning injuries sustained from a post-operative infection, the plaintiffs filed suit against the hospital alleging, inter alia, that the hospital failed to properly maintain and service all of the equipment used to sterilize the surgical instruments used in Mr. Dupuy’s surgery. In rejecting plaintiffs’ argument under the first Coleman factor, that the injuries were not “treatment-related” because the alleged failure to maintain and service the sterilization equipment occurred before Mr. Dupuy ever entered the hospital, the Supreme Court stated:
[Tjhere is no requirement that an action must be contemporaneous with a patient’s treatment in order to fall under the MMA. Indeed, the MMA itself specifically states that failures in the ‘training and supervision’ of healthcare providers is within the definition of malpractice, and such training and supervision necessarily occur before any treatment. ... Nothing in the statute’s plain language limits its application to direct treatment by a physician. Indeed, the statute includes under the ambit of the MMA injuries that are ‘based on healthcare or professional services rendered ... by a health care provider, to a patient ... ’ La. R.S. 40:1231.1(A)(13). The use of the broad term “health care provider,” rather than simply “physician” or “medical doctor,” necessarily includes actions which are treatment-related and undertaken by the Hospital in its capacity as health care provider— even if those actions are not performed directly by a | ^medical professional.
Dupuy, 187 So.3d at 442.
Like the Supreme Court in Dupuy, we specifically reject Ms. Bonilla’s assertion that the injury at issue must be contemporaneous with the act or omission at issue to fall within the purview of the LMMA. Furthermore, we agree with the finding of the trial court that the existence or absence of a policy regarding patient han-doffs is inherently treatment-related, and that the policy or custom of allowing physicians to determine what information, if any, to exchange during a patient handoff is also treatment-related and a matter of professional skill. Accordingly, we find that analysis under this factor weighs in favor of a finding that the administrative negligence claim against EJGH falls under the purview of the LMMA.

Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached

Ms. Bonilla argues that this factor weighs in her favor'because expert medical testimony would not be required to show' that the hospital breached its standard of care. Instead, she argues that the only expert testimony required would be that of hospital administrators to testify as to whether a handoff policy should have been implemented at EJGH because such written handoff policies are signed by hospital administrators. We disagree with Ms. Bon-illa’s contention. A hospital administrative policy which governs a physician’s practice of medicine is not created in a vacuum, but rather in coordination with the medical staff, including physicians, which develops *552 and adopts bylaws and rules for self-governance of professional activity and accountability to the governing body. See Louisiana Administrative Code 48:1.9321, What constitutes a proper handoff policy would necessarily require expert medical testimony and would be beyond the scope of common knowledge of ordinary laypersons. See, e.g., W.P. & E.P. v. Universal Health Servs. Found., 11-801 (La.App. 5 Cir. 3/27/12), 91 So.3d 1097 (allegations that hospital was negligent in placing a minor psychiatric patient in a room with another psychiatric patient with special medical needs, and in failing to provide appropriate supervision and monitoring of the minor child “involve issues of medical judgment which are treatment-related and are not within the common knowledge and experience of laymen.”); Coleman, 813 So.2d at 317 (allegation of improper transfer of patient from one hospital to another “was not a case in which the alleged wrongful conduct could be evaluated based on common knowledge”).
At a minimum, expert medical testimony will be required to establish the cause of Ms. Bonilla’s infection and consequent catastrophic injuries. See, Dupuy, 187 So.3d at 443. Specifically, if expert medical testimony cannot establish that an improper handoff by Ms. Bonilla’s treating physicians contributed to her injuries, then any testimony by a hospital administrator regarding whether the hospital breached its standard of care by failing to adopt a handoff procedure would not be relevant. Accordingly, we find that analysis under this factor weighs in favor of a finding that the administrative negligence claim against EJGH falls under the purview of the LMMA.

Whether the pertinent act or omission involved assessment of the patient’s condition

Ms. Bonilla argues that the failure to have an administrative policy on patient handoffs between physicians does not involve the medical assessment of Ms. Bonil-la’s condition in any way, but rather, the omission relates exclusively to the policy governing handoffs that should have been in place before Ms. Bonilla was ever a patient. However, Ms. Bonilla's own allegations clearly indicate that an appropriate administrative policy for patient handoffs between physicians includes specific information about a patient’s condition, a clinical impression of the patient, and a diagnosis of the patient’s condition when handing off the patient. All handoffs, and the policies which govern them, involve an assessment of the patient’s condition.
1 laMs. Bonilla also argues that the Court’s holding in Billeaudeau supports her position that an administrative failure to adopt a hospital-wide handoff policy did not involve the assessment of Ms. Bonilla’s condition. However, Billeaudeau may again be distinguished from this case. While a physician’s credentials may be assessed before the physician ever enters the hospital, and independently from that physician’s assessment of a patient’s medical condition, the decision to adopt or not adopt a handoff policy requires a review of the physicians’ practice of medicine inside the hospital, including how physicians assess a patient’s medical condition and what information they communicate regarding that condition. Accordingly, we find that analysis under this factor weighs in favor of a finding that the administrative negligence claim against EJGH falls under the purview of the LMMA.

Whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform

Ms. Bonilla argues that, under this factor, her claim sounds in general negligence *553 because the incident in question, the failure of the hospital administrators to implement a handoff procedure, was beyond the scope of the physician-patient relationship. Again Ms. Bonilla bases her argument on the distinction between the administrative failure to adopt a handoff policy and the actual handoffs by the physicians. The handoffs in question between Dr. Goo-dridge and Dr. Hogan clearly occurred in the context of the physician-patient relationship. It is unclear whether an administrative failure to adopt a policy which would directly affect the physician-patient relationship is “in the context” of that relationship. Under only this part of the fourth factor, it would be difficult to say it weighed in favor of finding the claim sounds in malpractice.
Both parties, however, disregard the other half of this factor; namely, whether a decision to adopt a hospital-wide handoff policy was within the scope of activities which a hospital is licensed to perform. In particular, EJGH, as the |igexceptor, has not pointed to any specific rules adopted by the Louisiana Department of Health and Hospitals pursuant to the Hospital Licensing Law, La. R.S. 40:2100, et seq., which pertain generally or specifically to handoffs between physicians. Accordingly, we find that analysis under this factor does not weigh in favor of a finding that the administrative negligence claim against EJGH falls under the purview of the LMMA.

Whether the injury would have occurred if the patient had not sought treatment

Like the treatment-related Coleman factor, this particular factor also implicates the issue of causation, but with the primary focus being on the alleged injury to the patient and the circumstances under which it occurred. See, Dupuy, 187 So.3d at 445.
Ms. Bonilla argues that if an “overly facile,” “but for” reasoning is adopted in analyzing this factor, then every patient injury in a hospital would be considered malpractice. This is so because every injured patient making a claim against a hospital would, by necessity, have to allege that some act or omission of the hospital staff caused her injury, and no act or omission on the part of the hospital staff would have occurred unless the patient entered the facility. In other words, “[i]n a general sense, any wrong that a patient suffers in a hospital or doctor’s office would not occur if the patient had not first entered the facility.” LaCoste, 966 So.2d at 529. In LaCoste, the Court recognized, however, that despite the necessity of the patient entering the facility, “many claims of medical malpractice resulting from omissions might not qualify as medical malpractice if this factor were applied singly and without relation to the other Coleman factors, because an omission, such as a failure to diagnose, ostensibly leaves a patient in the same position as she would have been in had she never sought treatment in the first place.” Id. Rather than apply a “but for” reasoning, the Court then analyzed this | ^factor in relation to the “treatment-related” Coleman factor, concluding that its finding that the particular wrongs alleged were not treatment-related, and the plaintiffs outcome if she had not sought treatment being unknown, did not weigh greatly in favor of finding the alleged wrongful conduct to be medical malpractice within the confines of the LMMA. Id.
In Billeaudeau, the Court, in quoting this discussion and analysis from LaCoste, stated that it took “... particular guidance from our holding in LaCoste ...” Billeau-deau, 16-0846 at p. 21. The Court concluded that, having found in its first factor analysis that the alleged wrongful conduct was not treatment-related, the fifth factor *554 “ .. .likewise does not weigh greatly in favor of finding the negligent credentialing alleged in the petition was medical malpractice under the LMMA.” Id. (emphasis in original).
In the case before us, Ms. Bonilla’s allegations of negligence are essentially that (1) her physicians failed to properly treat her bacterial infection; (2) that this failure was at least partly due to the physicians’ failure to properly communicate with one another when transferring Ms. Bonilla between physicians; and (3) the failure to properly transfer Ms. Bonilla between physicians was at least partly due to the failure of EJGH to have a handoff policy in place. In the record before us, there is nothing to suggest what the source of Ms. Bonilla’s bacterial infection was, or what her outcome might have been had she not sought treatment at EJGH. It is therefore somewhat difficult to evaluate this factor in the context of this case.
Furthermore, as discussed in our analysis of the treatment-related Coleman factor, we do not find that in a case where the viability of the administrative negligence cause of action is completely dependent upon the existence of a subsequent act of malpractice by a physician, that we can consider the allegation of administrative negligence independently from, and without consideration of, the subsequent act of alleged malpractice.
|2]Following the guidance of the Supreme Court in LaCoste and Billeaudeau to apply the Coleman factors in relation to one another, and having found the alleged administrative negligence of EJGH to be treatment-related under our first factor analysis, and further having found the viability of the administrative negligence claim to be completely dependent upon the existence of a subsequent act of malpractice by the physicians, we find that the fifth factor also weighs in favor of a finding that the administrative negligence claim against. EJGH falls under the purview of the LMMA.

Whether the tort alleged is intentional

Contrary to Ms. Bonilla’s assertion that the sixth Coleman factor is not at issue here because Ms. Bonilla did not allege an intentional tort, this factor is relevant to our determination that her claim arises out of malpractice. Intentional torts are clearly outside the scope of the LMMA. La. R.S. 40:1231.1(A)(13); Buford, 88 So.3d at 548. Had Ms. Bonilla alleged an intentional tort, then that claim would clearly not be considered malpractice. However, because Ms. Bonilla has alleged negligence on the part of the hospital administrators, who are qualified health care providers, this factor weighs in favor of a finding that her claim falls within the purview of the LMMA.
DECREE
We find that Ms. Bonilla’s claim against EJGH for failure to adopt a written physician handoff policy sounds in malpractice both as that term is defined under La. R.S. 40:1231.1(A)(13), and through an application of the Coleman factors. Therefore, the judgment granting the dilatory exception of prematurity and dismissing Ms. Bonil-la’s claim without prejudice is affirmed.
AFFIRMED

. No mention of improper handoffs is made in the medical malpractice complaint attached as an exhibit to Ms. Bonilla’s petition for damages, It is unknown whether the complaint was amended to place the question of improper handoffs by the physicians before the medical review panel.

. Specifically, Ms. Bonilla makes the following allegation with regard to defendants’ negligence and her resulting damages in the complaint: "Defendants breached the standard of care ordinarily exercised by obstetricians/gynecologists and hospitals in the following nonexclusive ways: by failing to treat Ms. Bonilla's infection with a long course of intravenous therapy of appropriate broad spectrum antibiotics; by suppressing and masking, but not treating, the infection with only one day of intravenous cefoxitin and five 500 mg doses of cefalcor over a 31-hour period and then discontinuing antibiotics by discharging Ms. Bonilla without a prescription for antibiotic medication; and by failing to treat the infection post-discharge. Had defendants properly treated Ms. Bonilla’s infection, she would not have suffered septic shock and toxic shock syndrome, her amputation and other permanent injuries, and enormous pain and suffering and she would not have incurred massive expenses for past and future medical care and related benefits.”

. According to Ms. Bonilla, this petition is based on information learned during the course of discovery in the medical malpractice proceedings before the medical review panel.

. Whether or not Louisiana law recognizes an independent cause of action against hospital administrators for negligent failure to adopt a handoff policy when the plaintiff alleges multiple other substantial, contributing causes (including malpractice by her treating physician) is a question best analyzed on an exception of no cause of action. See Severn Place Assocs. v. Am. Bldg. Servs., 05-859 (La.App. 5 Cir. 04/11/06), 930 So.2d 125.

. Prior to the enactment of House Concurrent Resolution No. 84 of the 2015 Regular Session, La. R.S. 40:1231.8 was previously designated La. R.S. 40:1299.47.

. In its application of the Coleman factors, the trial court made the following findings: the existence or absence of a policy regarding patient handoffs is inherently treatment-related and that the policy or custom of allowing physicians to determine what information, if any, to exchange during a patient handoff is also treatment-related and a matter of professional skill; a determination of what information, if any, should have been shared during Ms. Bonilla's handoffs and whether a policy should have been established to guide the sharing of information between her physicians during those handoffs necessarily requires an assessment of her condition at the time in question; expert medical evidence would assist the trier of fact in determining whether the appropriate standard of care was breached in failing to establish a policy regarding the exchange of information between Ms. Bonilla's physicians and whether that absence caused or was otherwise a substantial factor contributing to her injury.

. It is undisputed that both EJGH and the physicians are "qualified health care providers” as defined in the LMMA.

. As previously stated, it is unknown whether these claims have been submitted to a medical review panel.

. Claims were also made against other defendants.

. We note that in Billeaudeau, the Supreme Court considered the question of whether negligent credentialing fell within the definition of malpractice under the LMMA upon review of a motion for partial summary judgment. In that case, there was additional evidence in the record beyond the plaintiffs’ petition which indicated that the hospital had failed to follow its own bylaws regarding credentialing. As previously noted, in this case, no evidence was admitted at the hearing on the dilatory exception of prematurity.